Case No. 13-1369

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

VCA CENVET, INC., now known as
Antech Diagnostics, Inc.

Plaintiff/Appellant

v.

CHADWELL ANIMAL HOSPITAL, LLC

Defendant/Appellee

On Appeal from the United States District Court
For the District of Maryland (Northern Division)
Case No. 1:11-CV-01763-JKB

---

**BRIEF OF APPELLANT VCA CENVET, INC.**
_____

BARNES & THORNBURG LLP          SPENCE & BUCKLER, P.C.
Brian E. Casey                  Patrick R. Buckler
David R. Pruitt                 100 W. Pennsylvania Ave.
6th Floor, 1st Source Bank Center  Suite 301
100 N. Michigan Street          Towson, Maryland 21204
South Bend, Indiana 46601       (443) 470-9105 (phone)
(574) 233-1171 (phone)          (443) 769-1562 (fax)
(574) 237-1125 (fax)

*Attorneys for Plaintiff-Appellant*
*Antech Diagnostics, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

VCA Cenvet, Inc., now known as Antech Diagnostics, Inc., is a wholly-owned subsidiary of Vicar Operating, Inc., which is a wholly-owned subsidiary of VCA Antech, Inc.  Each of these entities has a financial interest in the outcome of this litigation.  VCA Antech, Inc. is a publicly held corporation.  Veritas Asset Management (UK) Limited and The Real Return Group Limited have shared voting and dispositive power over approximately 10.5% of VCA Antech, Inc.'s outstanding equity.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ....................................................... iv

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF ISSUES ......................................................... 1

STATEMENT OF THE CASE ...................................................... 2

STATEMENT OF FACTS .......................................................... 4

   I.    Factual Background Giving Rise To The Lab Services Agreement ................................................................. 4

   II.   The LSA's Terms ........................................................ 6

   III.  Chadwell's Conduct After Entering Into The LSA. ................. 8

   IV.  The Parties' Litigation .................................................. 8

      A.   The District Court's First Opinion And Request For Further Briefing. ................................................. 10

      B.   The Parties' Supplemental Submissions Regarding Antech's Lost Profits ........................................... 12

      C.   The Court Requests Further Supplemental Briefing. ....... 16

      D.   The Court Decides The Parties' Summary Judgment Motions. ...................................................... 17

SUMMARY OF ARGUMENT .................................................... 19

ARGUMENT ...................................................................... 21

   I.    Standard of Review ..................................................... 21

   II.   The District Court Erred When It Misapplied The Proper Summary Judgment Inferences and Granted Chadwell's Summary Judgment Motion. ........................................... 22

      A.   The District Court Was Required To Treat Each Motion Separately, Giving All Reasonable Inferences To The Non-Movant In Each Case. .................................... 23

      B.   The District Court Erred By Giving Chadwell The Benefit Of Disputed Inferences On Chadwell's Motion For Summary Judgment. .......................................... 25

         a.   California Law Supports Antech's Lost Profits Calculation. ............... 28

         b.   The Northern District Of Illinois Accepted Antech's Lost Profits Calculation In A Remarkably Similar Case Applying California Law. ...... 33

III.   The District Court Erred When It Concluded That Awarding Lost Profits Under The LSA Was Unconscionable....................................36

   A.   Chadwell Waived Its Unconscionability Argument By Only Raising It After Discovery Closed. ...............................38

   B.   The District Court Failed To Adhere To Civil Code §1670.5. .....................................................................................40

   C.   The District Court Failed To Employ The Unconscionability Analysis Typically Required By California Law. .......................................................................41

     a.   Lost Future Profits Damages Are Not Procedurally Unconscionable. .43

     b.   Lost Future Profits Damages Are Not Substantively Unconscionable. 44

   D.   The District Court Erred When It Effectively Ruled That Breaching A Service Agreement Can Never Result In Lost Future Profits. ..............................................................................46

   E.   The District Court Failed To Consider California Case Law When Construing The Unconscionability Doctrine And Civil Code §3359..................................................................48

IV.   The District Court Erred When It Failed To Grant Summary Judgment In Favor Of Antech. ...................................................52

CONCLUSION ...................................................................................53

REQUEST FOR ORAL ARGUMENT ...............................................54

RULE 32 CERTIFICATE OF COMPLIANCE ...................................56

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .........................................................................21, 27

*Antech Diagnostics, Inc. v. Downers Grove Animal Hospital & Bird
    Clinic, P.C.*, Civ. No. 12C2736, 2013 WL 773034 (N.D. Ill. Feb.
    28, 2013) ............................................................................................*passim*

*Brinkley v. Harbour Rec. Club*,
    180 F.3d 598 (4th Cir. 1999), *overruled on other grounds by
    Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ....................................39

*Christian Heritage Academy v. Okla. Secondary Sch. Activities
    Association*, 483 F.3d 1025 (10th Cir. 2007) ..........................................25

*Continental Airlines, Inc. v. United Airlines, Inc.*,
    277 F.3d 499 (4th Cir. 2002) ...................................................................25

*Empire Gas Corp. v. American Bakeries Co.*,
    840 F.2d 1333 (7th Cir. 1988) ...........................................................47, 49

*Humetrix, Inc. v. Gemplus S.C.A.*,
    268 F.3d 910 (9th Cir. 2001) ...................................................................28

*ITCO Corp. v. Michelin Tire Corp.*,
    722 F.2d 42 (4th Cir. 1983) .....................................................................24

*Imgarten v. Bellboy Corp.*,
    383 F. Supp. 2d 825 (D. Md. 2005) ........................................................39

*Kagan v. Unum Provident*,
    775 F. Supp. 2d 659 (S.D.N.Y. 2011) .....................................................24

*MacDonald, Sommer & Frates v. Yolo County*,
    477 U.S. 340 (1986) .................................................................................36

*Monumental Paving & Excavating, Inc. v. Pa. Mfrs' Assn. Ins. Co.*,
   176 F.3d 794 (4th Cir. 1999) ............................................................22, 25

*PBM Products, LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) ......................................................................21

*Patten Grading & Paving, Inc. v. Skanska USA Building, Inc.*,
   380 F.3d 200 (4th Cir. 2004) ......................................................................39

*Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*,
   2011 WL 6140874 (N.D. Cal. Dec. 8, 2011) ..............................................15

*Rains v. Cascade Industrial, Inc.*,
   402 F.2d 241 (3rd Cir. 1968) ......................................................................24

*Rossignol v. Voorhaar*,
   316 F.3d 516 (4th Cir. 2003) ................................................................22, 24

*Rountree v. Fairfax County School Board*,
   933 F.2d 219 (4th Cir. 1991) ......................................................................27

## STATE CASES

*Armendariz v. Foundation Health Psychcare Serv., Inc.*,
   24 Cal.4th 83 (2000) ..................................................................................42

*Arntz Contracting Co. v. St. Paul Fire & Marine Insurance Co.*,
   47 Cal. App. 4th 464 (Cal. App. 1st Dist. 1996) ..................................15, 28

*Aron v. U-Haul Co. of California* ,
   143 Cal. App. 4th 796 (Cal.App. 2d Dist. 2006) ..................................45, 46

*Aronowicz v. Nalley's, Inc.*,
   30 Cal. App. 3d 27 (Cal. App. 2d Dist. 1972) ............................................30

*Bennini, Inc. v. Tai Yuen Textile Co., Ltd.*,
   2002 WL 1067350 (Cal. Ct. App. May 29, 2002) ......................................15

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
   226 Cal. App. 3d 442 (Cal. App. 5th Dist. 1990) ......................................15

*Eggink v. Robertson*,
    191 Cal. App. 2d 496 (Cal. App. 3d Dist. 1961)......................................48

*Gerwin v. Southeastern Cal. Association of Seventh  Day Adventists*,
    14 Cal. App. 209 (Cal. Ct. App. 1971)......................................................10

*Grupe v. Glick*,
    26 Cal. 2d 680 (1945)..............................................................................28

*Guntert v. City of Stockton*,
    55 Cal. App. 3d 131 (Cal. Ct. App. 1976)................................................29

*Hacker Pipe & Supply Co. v. Chapman Valve Manufacturing Co.*,
    17 Cal. App. 2d 265 (Cal. App. 2d Dist. 1936)........................................29

*Hoag v. Jenan*,
    86 Cal. App. 2d 556 (Cal.App. 2d Dist. 1948).........................................29

*Holmestake Mining Co. v. Talcott*,
    161 Cal. App. 2d 566 (Cal.App. 4th Dist. 1958)................................47, 49

*Horowitz v. Fitch*,
    216 Cal. App. 2d 303 (Cal. App. 1st Dist. 1963)....................................48

*Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court*,
    133 Cal. App. 4th 396 (2005)...................................................................40

*Johnson v. Stanhiser*,
    72 Cal. App. 4th 357 (Cal.App. 4th Dist. 1999) .....................................33

*Little v. Amber Hotel Co.*,
    202 Cal. App. 4th 280 (Cal. App. 2d Dist. 2011)....................................10

*Macken v. Martinez*,
    214 Cal. App. 2d 784 (1963)....................................................................36

*Morris v. Redwood Empire Bancorp*,
    128 Cal. App. 4th 1305 (Cal. App. 2005) ................................................46

*Natural Soda Prod. Co. v. City of Los Angeles*,
  23 Cal. 2d 193 (1943) ..............................................................29

*New West Charter Middle School v. Los Angeles Unified School
  District*, 187 Cal. App. 4th 831 (Cal. App. 2d Dist. 2010) ...............10, 25

*Plotnik v. Meihaus*,
  208 Cal. App. 4th 1590 (Cal. App. 4th Dist. 2012) ..................................48

*Postal Instant Press, Inc. v. Sealy*,
  43 Cal. App. 4th 1704 (Cal. App. 2d Dist. 1996)............................*passim*

*Ray v. Jackson*,
  219 Cal. App. 2d 445 (Cal.App.1st Dist. 1963) .......................................48

*S.C. Anderson, Inc. v. Bank of America National Trust & Savings
  Association*, 24 Cal. App. 4th 529 (1994) .................................30

*S. Jon Kreedman & Co. v. Meyers Brothers Parking-Western Corp.*,
  58 Cal. App. 3d 173 (Cal. App. 2d Dist. 1976).........................................30

*Sanchez-Correa v. Bank of America*,
  38 Cal. 3d 892 (1985) ..............................................................30

*Seffert v. Los Angeles Transit Lines*, 367 P.2d 337 (Cal. 1961)..............27, 48

*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*,
  78 Cal. App. 4th 847 (Cal. Ct. App. 2000) ........................................32, 33

*Stott v. Johnston*,
  36 Cal. 2d 864 (1951) ..............................................................30

*Walnut Producers of California v. Diamond Foods, Inc.*,
  187 Cal. App. 4th 634 (2010)..................................................................40

*Wayne v. Staples, Inc.*,
  135 Cal. App. 4th 466 (Cal. App. 2nd Dist. 2006) ..........................*passim*

## FEDERAL STATUTES

28 U.S.C. §1291................................................................................1

28 U.S.C. §1332................................................................................1

## FEDERAL RULES

Fed. R. Civ. P. 8(c) ........................................................................38

Fed. R. Civ. P. 52...........................................................................24

Fed. R. Civ. P. 56(a) ......................................................................21

## STATE STATUTES

Cal. Civil Code §1670.5 ..........................................................40, 41

Cal. Civil Code §3300 ....................................................................25

Cal. Civil Code §3359 ..............................................................*passim*

## MISCELLANEOUS

RESTATEMENT (SECOND) OF CONTRACTS §351 (1981)............................18, 37

11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.120
    (3d ed. 2004)............................................................................22

10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE
    & PROCEDURE, §2720 (3d ed. 2004) ................................................22, 24

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action under 28 U.S.C. §1332 because there is complete diversity between the parties, and the amount-in-controversy exceeds the jurisdictional minimum.  On September 11, 2012, the district court issued its first decision with respect to the parties' cross-motions for summary judgment.  [JA 252-65].[1]  At that time, the court held both motions in abeyance pending further briefing.  [JA 252].  On February 22, 2013, the district court issued its Memorandum Opinion and Judgment Order in which it granted Defendant-Appellee Chadwell Animal Hospital, LLC's ("Chadwell's") summary judgment motion and denied Plaintiff-Appellant VCA Cenvet, Inc.'s ("Antech's")[2] cross-motion for summary judgment.  [JA 265, 386-96, 397].  Antech filed its Notice of Appeal on March 20, 2013 and is therefore timely under Rule 4(a)(1) of the Federal Rules of Appellate Procedure.  [JA 398].  This court has appellate jurisdiction under 28 U.S.C. §1291 because the district court's orders are "final orders."

## STATEMENT OF ISSUES

1.     Did the district court err when it granted Chadwell's summary judgment motion, taking the question of Antech's lost profits damages away from the

---

[1] Appellant refers to page citations in its Joint Appendix as "JA __."  References to filings on the district court's docket are cited as "R.__."

[2] VCA Cenvet, Inc. is referred to throughout as "Antech."

jury when Antech was the only party submitting relevant evidence of lost profits and when Chadwell failed to introduce any contrary evidence?

2.    Did the district court err when it concluded that awarding Antech its lost future profits would be unconscionable without performing the analysis required under California law?

3.    Did the district court err when it denied Antech's summary judgment motion and refused to award Antech any lost profit damages even though Antech introduced substantial evidence of its lost profits and Chadwell introduced no contrary evidence quantifying Plaintiff's lost profits?

## STATEMENT OF THE CASE

Antech is a California corporation that provides laboratory testing services to veterinary hospitals.  [JA 386].  Chadwell is a veterinary hospital in Maryland. *Id.*  In December 2009, Chadwell and Antech entered into a Laboratory Services Agreement ("LSA") whereby Chadwell agreed to purchase laboratory services exclusively from Antech for four years in return for discounted prices and rebates. *Id.*  Chadwell has conceded that it breached the LSA with Antech.  [JA 254, 388]. Antech sued Chadwell for that breach and sought to recover its lost profits.

This appeal results from orders entered by the United States District Court for the District of Maryland.  Notwithstanding Chadwell's admitted breach of the LSA, the district court granted Chadwell's motion for summary judgment and

denied Antech's cross-motion for summary judgment. These orders prohibited Antech from recovering any lost profits for Chadwell's breach of the LSA.

### *The Lawsuit*

On June 28, 2011, Antech filed its Complaint against Chadwell and Keith Gold, D.V.M. ("Gold"), asserting breach of contract and unjust enrichment claims against each. [JA 9-13]. Chadwell and Gold answered on July 13, 2011. [JA 14-16]. On October 4, 2011, they moved for summary judgment and/or dismissal for lack of subject matter jurisdiction. [JA 17-26]. The district court denied the relief requested by Chadwell but entered judgment in favor of Gold. [JA 49-51][3].

### *The Motions for Summary Judgment*

Following discovery, Chadwell filed its motion for summary judgment. [R.44]. Chadwell's motion for summary judgment conceded that it breached the LSA but sought to cap damages at $16,096.66. On July 16, 2012, Antech filed a combined response to Chadwell's summary judgment motion and its own summary judgment motion. [R.47]. Antech sought to recover the expected profits of $198,644 that it would have received but for Chadwell's breach of the LSA.

### *The District Court's Orders*

On September 11, 2012, the district court issued its Memorandum Opinion.

---

[3] The grant of Gold's summary judgment motion is not at issue in this appeal.

- 3 -

[JA 252-265]. In that opinion, the district court rejected all three of Chadwell's primary arguments in its summary judgment motion. [JA 252-65]. The court also stated that Antech was "correct in asserting that it can recover its lost profits in this case, assuming that they can be proven with reasonable certainty." [JA 263]. However, the court held the cross-motions for summary judgment in abeyance, [JA 252], and ordered further briefing on several damages issues. [JA. 264-65].

Following the parties' supplemental responses to the district court's questions, [R.59, 61], the court again asked for additional briefing regarding mitigation of damages. [JA 384]. The parties then filed further supplemental memoranda specifically addressing the court's mitigation questions. [R. 65, 68].

It was only after the parties' further briefing and despite the significant amount of evidence submitted by Antech that the district court denied Antech's summary judgment motion and granted Chadwell's summary judgment motion. [JA. 386-97]. Antech filed this appeal on March 20, 2013. [JA 398].

## STATEMENT OF FACTS

## I. Factual Background Giving Rise To The Lab Services Agreement

Chadwell is a veterinary hospital in Maryland owned by Gold and Dr. Ruby Schaupp ("Schaupp"). [JA 56]. Antech provides laboratory services to veterinary hospitals like Chadwell. Antech provided these services to Chadwell beginning in approximately 2003. [JA 90]. Chadwell dealt principally with an Antech sales

representative, Mark McLean ("McLean"), through casual meetings at the hospital every two to three months.  [JA 93].

Not long before December 22, 2009, McLean visited Chadwell and proposed to Gold that the hospital could get a further rebate on its laboratory service costs by entering into a contract to use Antech's laboratory services for a specified term.  [JA 95].  Gold indicated that he "would be interested in seeing" an agreement, and McLean said he would prepare one "and bring it by to review and hopefully get their signature."  [JA 97].

On December 22, 2009, McLean returned to the hospital with the LSA and "went over it with [Gold] paragraph by paragraph."  [*Id.*].  Gold described the meeting as "pretty nonchalant, . . . , not a formal meeting or anything like that." [JA 58].  Gold did not have any questions for Mr. McLean.  [JA 58, 98]. According to him, he "thought it was a no-brainer."  [JA 59].

In the LSA, Gold was given four alternative contract terms for Chadwell to choose from; the longer the term, the greater the rebate.  [JA 26, 98-99].  Gold executed the LSA on behalf of Chadwell at that meeting.  [JA 21-26, 98].  He initialed the Loyalty Rebate annex to the LSA, choosing the longest term, four years, and thus the largest rebate (17%).  [JA 26].  Upon signing the LSA, Gold "shouted out to [Schaupp], . . . I just saved us 17 percent a month."  [JA 98].

Chadwell has never demonstrated, or even claimed, that it was pressured or threatened by anyone at Antech to sign the LSA. Chadwell does not argue that it was prohibited from continuing to use Antech's services without entering into the LSA or that Chadwell had no other alternatives for its outside laboratory services.

## II.    The LSA's Terms

The LSA is a six-page contract (including its summary page), written on one-side, in normal type, and in plain English. [JA 21-26]. The LSA contains a "Minimum Average Annual Fee" provision that required Chadwell "to utilize Antech to provide Laboratory Services required by [Chadwell] in an amount equal to a minimum of $78,000 or $6500 net per month. . . in accordance with the provisions of Section 1 below." [JA 21]. Section 1 provides that Chadwell will "cause all veterinary diagnostic and clinical laboratory services . . . that are to be performed for and on behalf of [Chadwell], to be performed by a veterinary diagnostic laboratory owned by Antech." [JA 22].

The LSA does not require Chadwell to purchase 100% of its laboratory services from Antech. To the contrary, Chadwell can obtain up to 10% of its services from another provider. [*Id.*, §1.1.1]. Chadwell also can obtain services elsewhere if Antech can not provide those services, and Chadwell can provide its own services if it was so equipped. [*Id.*, §§1.1.2, 1.1.3].

- 6 -

Under the LSA, Antech agrees to provide services to Chadwell that are equal to or better than similar laboratories. [*Id.*, §1.2]. If Chadwell is dissatisfied with Antech's services, the LSA provides a dispute resolution procedure to address those issues. [*Id.*].

Section 3 of the LSA addresses the terms and conditions of the rebate. [*Id.*, §3]. It provides that, if Chadwell meets its minimum monthly volume, it will receive the percentage rebate Chadwell chose for the contract term. [*Id.*, §3.1]. However, if Chadwell "breaches the exclusivity provision set forth in Section 1" or fails to pay its invoices promptly, that "constitute[s] an event of default with respect to the Rebate." In that case, Antech "may declare the entire amount of the Rebates previously paid to be billable and due immediately." [*Id.*, §3.2]. Simply falling below the Minimum Average Annual Fee in a particular month is not considered a default though it means that Chadwell would not receive a rebate that month. [*Id.*]

Section 5 addresses terminating the LSA. Antech can terminate the LSA upon written notice to Chadwell if "a default occurs as described under Section 3.2," *or* if [Chadwell] is otherwise in material breach of the terms and provisions [of the LSA]." [*Id.*, §5]. The LSA is governed by California law. [JA 23].

- 7 -

## III.   Chadwell's Conduct After Entering Into The LSA.

Chadwell abided by the LSA from December 2009 until November 2010. [JA 61].  Then, Chadwell purportedly became disenchanted with Antech because it was affiliated with VCA, a large veterinary hospital network, which, in Dr. Gold's view, "is just a humongous company, and . . . they're just buying everybody out." [JA 63].  This despite Antech having been an affiliate of VCA in 2003 when the parties began doing business and in 2009 when they executed the LSA.  Chadwell never complained about the quality of Antech's services, never notified Antech of any problems with those services, and never claimed Antech failed to perform under the LSA.  Nonetheless, with over three years left on the contract, Chadwell breached the LSA in November 2010 and began doing business with IDEXX Laboratories, Inc. ("IDEXX"), Antech's chief competitor.  [JA 222].  Ironically, Chadwell executed an agreement with IDEXX to use IDEXX's laboratory services for a four year term.  [JA 62].

## IV.   The Parties' Litigation

Antech filed its Complaint against Chadwell and Gold on June 28, 2011, asserting breach of contract and unjust enrichment claims.  [JA 9-13].  Chadwell and Gold answered on July 13, 2011.  [JA 14-16].  Neither Defendant asserted unconscionability as an affirmative defense to Antech's claims.  [*Id.*]   In

November, the court granted Gold's summary judgment motion because he did not sign the LSA in his individual capacity.  [JA 49-51].

The parties conducted discovery until June 22, 2012 when discovery closed. [R. 42].   Five days later, Chadwell moved for summary judgment.   [R. 44]. Chadwell's motion sought to eliminate Antech's claim for lost future profits and cap Antech's damages at $16,096.66, the amount of rebates Chadwell received. [R. 44-1, p. 21].  For the first time, Chadwell argued that awarding Antech its lost future profits would be unconscionable.  [*Id.* at 19-21].   As support for this argument, Chadwell relied exclusively on a franchisor-franchisee case, *Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th 1704 (Cal. App. 2d Dist. 1996) ("*Postal Instant*"), and Civil Code §3359, which provides that "[d]amages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."  [R. 44-1, p.19-21].

On July 16, 2012, Antech filed its combined response to Chadwell's summary judgment motion and its own summary judgment motion.   [R.47]. Antech sought to recover the rebates it paid and the expected *net profits* that it would have realized but for Chadwell's breach of the LSA.  [R. 47-1, p.5-7].  It further argued that Chadwell's waiver, estoppel, and lack of notice arguments were meritless and that awarding lost future profits was not unconscionable or grossly

- 9 -

oppressive. [*Id.* at 7-11]. Antech also noted that, prior to its summary judgment motion, Chadwell had "never claimed that the lost profits sought by Antech are somehow unconscionable or grossly oppressive." [*Id.* at 10].

## A. The District Court's First Opinion And Request For Further Briefing.

On September 11, 2012, the district court issued its Memorandum Opinion. [JA 252-65]. In that opinion, the court rejected all the principal arguments in Chadwell's summary judgment motion. [*Id.*]. As for Chadwell's unconscionability argument, the court stated that it "had yet to [be] proven what Plaintiff's lost profits are," so "[t]here is thus no way to tell at this point whether or not an award of those profits would be unconscionable." [JA 261].

The court agreed that the "standard measure of damages for breach of contract under California law is the aggrieved party's expectation interest." [JA 262] (citing *New West Charter Middle School v. Los Angeles Unified School Dist.*, 187 Cal. App. 4th 831, 844 (Cal. App. 2d Dist. 2010)). The court further agreed with Antech that "[a] party's loss of expected profits can be a valid measure of expectation interest, but, like all contract damages under California law, the amount of profits expected must be proved with reasonable certainty." *Id.* (citing *Little v. Amber Hotel Co.*, 202 Cal.App.4th 280, 305 (Cal. App. 2d Dist. 2011)). The court also agreed with Antech that the "loss of anticipated profits" meant "net and not gross profits." *Id.* (citing *Gerwin v. Southeastern Cal. Ass'n of Seventh*

- 10 -

*Day Adventists*, 14 Cal.App. 209, (Cal. Ct. App. 1971)). As a result, the court stated that Antech was "correct in asserting that it can recover its lost profits in this case, assuming that they can be proven with reasonable certainty." [JA 263].

It further stated that Antech was not entitled to have Chadwell spend the Minimum Average Annual Fee,[4] but it *was* "strictly entitled to" "four years of exclusive dealing" with Chadwell. [JA 263]. Chadwell, for its part, was "entitled to four years of lab services at an agreed upon rate, plus the option of getting a special deal (the rebates) if it did a certain volume of business (the minimum annual fee)." [*Id.*] According to the court, how much business Antech would "have actually done over the remaining contract term" as well as the cost it would have incurred providing that business were elements of Antech's case "that it will have to prove by a preponderance of the evidence." [JA 263-64].

The district court then held both summary judgment motions in abeyance. [JA 265]. Acknowledging that the case was now "in an awkward posture," the court ordered further briefing on several damages-related questions. [JA. 264-65]. Specifically, the court asked the parties the following questions:

(1)    What evidence is contained in the record with respect to the probable gross revenue that Defendant would likely have generated under the terms of LSA after its breach?

---

[4] As discussed *infra* at 31-32, this reading of the Minimum Average Annual Fee is incorrect. The Fee also established the minimum services Antech was to provide.

(2)    What evidence is contained in the record with respect to Plaintiff's probable profit margin on revenue generated under the LSA?

(3)    Is the evidence described in the preceding questions sufficient to prove Plaintiff's lost profits with the level of certainty required under California law?

(4)    If so, what are those profits?

(5)    If not, then what does California law prescribe as the alternative measure of damages or other remedy?

*Id.*  Importantly, the court did *not* solicit evidence or ask about evidence that would support a finding of unconscionability, which is consistent with the court's conclusion that "[a] party's loss of expected profits can be a valid measure of expectation interest."  [JA 262].  The court further required the parties to respond using the existing record because "discovery in this case is closed . . . and will not be reopened."  [JA 265].  Moreover, although Chadwell first, and separately, moved for summary judgment, the court required Antech to answer the court's questions first, and did not give Antech an opportunity to reply following Chadwell's submission.  *Id.*  Finally, the court did not acknowledge in its opinion that any inferences to be drawn from the parties' submissions should vary depending on which party's summary judgment motion was being evaluated.

## B.    The Parties' Supplemental Submissions Regarding Antech's Lost Profits

Antech's supplemental submission in response to Chadwell's summary judgment motion and in support of its own summary judgment motion answered

- 12 -

the court's questions and explained, using the evidentiary record, how it had calculated with "reasonable certainty" that Antech's lost profits over the remaining term of the LSA were $198,644.  [R.59, p.1].

In moving for summary judgment (and in opposing Chadwell's motion), Antech submitted the following evidence to support its lost profits calculation:

- Deposition testimony from Gold [JA 53-73];

- Deposition testimony from Schaupp [JA 74-86];

- Deposition testimony from Matthew Koch (an Antech employee) [JA 113-34];

- Deposition testimony from Sal Rallo (an Antech employee) [JA 135-50];

- Deposition testimony from Bruce Bargmann (an Antech employee) [JA 151-60, 279-99];

- Various emails regarding the LSA [JA 170-77];

- Calculations regarding lost profits [JA 251, 266-67, 325-57].

Antech used this evidence to determine that its lost profits totaled $198,644 and to explain the methodology behind that calculation in the following way.  [JA 267].  First, Antech calculated its 2010 gross revenue for the Chadwell account by totaling the amounts billed using its actual invoices (net of the 17% rebate) for the twelve months ending November 2010.  [JA 279, 287].

Second, Antech then estimated that the future revenue Chadwell would provide would increase 4% annually, resulting in future revenue as follows: $89,627 for 2011, $93,212 for 2012 and $96,940 for 2013. [JA 267 & 288]. Antech based this estimate on its industry experience, its projected annual fee increases for tests, and its projections about the likelihood that Chadwell's business with Antech would grow over the term of the LSA. [JA 288].

Next, Antech deducted its estimated future variable costs. [JA 267]. These costs vary as revenue varies. They are all costs other than fixed costs and include lab supplies, client supplies, send out testing fees, royalty fees and sales and marketing fees. [JA. 267, 281, 293-94 & 337]. Antech estimated its variable costs based on its actual 2010 results, which coincide with the amounts in VCA Antech's Form 10-K's. [JA. 337 & 341-46]. Antech estimated that its variable costs would increase 4% annually also. [JA 299]. Finally, Antech calculated its estimated lost profits under the LSA, which are the difference between Antech's lost revenue and its lost variable costs for the remaining years: $63,635 for 2011; $66,181 for 2012; and $68,828 for 2013. [JA. 267, 287-88 & 348-55].

Antech corroborated its estimated future revenues by introducing evidence of the actual invoices Chadwell paid for IDEXX's laboratory services, under its contract with Chadwell, after Chadwell breached the LSA. [JA 325-337]. IDEXX's actual invoices from December 2010 through August 2011 totaled

- 14 -

$67,971.49.  [JA 326].  That amount is within $1,400 of the estimated lost revenue calculated by Antech using the evidence and methods described above.  [*Id.*].

Chadwell responded to the court's order principally with legal argument.  It argued first that restitution (*i.e.*, simply returning the rebates), not lost profits, was the correct measure of damages.  [R. 61, p. 1-2, 11].  Next, it argued that lost profits could not be proven with "reasonable certainty."  [*Id.* at 2-9].  In doing so, Chadwell principally questioned some of Antech's assumptions (specifically, the 4% annual increase in revenue) and the merit of comparing Antech's revenue projections to IDEXX's actual billings to Chadwell.  [*Id.* at 3-5].  Chadwell also disputed whether Antech's estimated variable costs calculations (which were based on Antech's overall variable cost margin) sufficiently approximated Antech's variable costs for providing services specifically to Chadwell.  [*Id.* at 6-8].

Chadwell then reiterated its assertion, based on *Postal Instant* and Civil Code §3359, that awarding Antech lost future profits would be unconscionable, unreasonable or grossly oppressive.  [*Id.* at 9-10].  Yet, tellingly, Chadwell also argued that "the determination of the proper amount of damages should be presented to a jury," because the "'[r]easonableness' of the evidence . . .  regarding VCA's future lost profits is for the jury to decide."  [*Id*. at 11-12].[5]

---

[5] Citing *Bennini, Inc. v. Tai Yuen Textile Co., Ltd.*, 2002 WL 1067350 (Cal. Ct. App. May 29, 2002); *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47

## C.    The Court Requests Further Supplemental Briefing.

Following the parties' supplemental briefing, the court again asked for additional briefing, this time about mitigation of damages.  [JA 384].  The court asked the following:

> (1)    To what extent, if any, does California law require Plaintiff to mitigate its lost profits?
>
> (2)    What evidence is contained in the record with respect to the efforts that Plaintiff undertook to mitigate its lost profits? and
>
> (3)    How does that evidence, if any, affect the analysis of lost profits in this case?
>
> [*Id.*]

The court again did not solicit briefing or evidence about the potential unconscionability of awarding lost future profits, and it again underscored that it would not reopen discovery.  [JA 384-85]  The parties then filed further supplemental memoranda addressing these questions.  [R. 65, 68].  Antech pointed out that, as an affirmative defense, Chadwell had the burden to prove that Antech did not mitigate its damages.  [R. 68, p.2].  Because Chadwell did not explore this issue in discovery or introduce evidence supporting such an affirmative defense, mitigation should not impact the court's lost profits analysis.  [*Id.*]

Cal.App. 4th 464, 489 (Cal. App. 1st Dist. 1996); *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App. 3d 442, 469-70 (Cal. App. 5th Dist. 1990); *Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*, 2011 WL 6140874 (N.D. Cal. Dec. 8, 2011).

**D.      The Court Decides The Parties' Summary Judgment Motions.**

The district court issued its second Memorandum Opinion on February 22, 2013, granting Chadwell's summary judgment motion and denying Antech's motion. [JA 386-96]. The court concluded that Antech's damages were limited to the $16,096.66 in rebates Chadwell received. [JA 395].

The district court first acknowledged, as it did before, that "the standard measure of damages for breach of contract under California law is the aggrieved party's expectation interest." [JA 390]. Damages are limited to net profits (taking into account variable costs), and those must be established with reasonable certainty. [*Id.*]. However, after stating these general principles, the court changed course and held that Antech had not "offered sufficient evidence to establish the occurrence and extent of its lost profits with reasonable certainty, because Plaintiff has not offered evidence of the cost of its performance of services for Defendant under the LSA." [JA 390-91]. The court concluded there was: "(1) No direct evidence of its expenses in performing services for Defendant under the LSA, or even its usual profit margin in connection with the type of lab services it performed for Defendant under the LSA; (2) no evidence to support the assumption that its company-wide variable costs are comparable to the cost of its performance under the LSA; and (3) very little evidence to support its assertion that its company-wide variable costs are approximately 29% of revenue." [JA 391].

- 17 -

Despite rejecting Chadwell's unconscionability argument before and stating that Antech could recover its lost future profits [JA 263], the district court concluded that "even if Plaintiff had established that Defendant's breach caused it to lose anticipated profits of $198,644.00, the court would find such an award of damages in this case to be unconscionable." [JA 394]. As support, the district court relied solely on Civil Code §3359, which provides that "where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered," and on RESTATEMENT (SECOND) OF CONTRACTS §351 (1981) which provides that "[a] court may limit damages for foreseeable loss by excluding recovery for loss of profits . . . if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." *Id.*

The court explained that it would be unconscionable to award lost profits because it would cause Chadwell to "pay twice for all of its lab testing requirements for a three-year period – once to compensate the replacement company that performs the tests and once to compensate Plaintiff for its lost profits" despite the fact that Antech would, according to the court, "not [be] performing any services." *Id.* This appeal followed.

## SUMMARY OF ARGUMENT

Neither party disputes that Chadwell breached the LSA. [R. 50, p.1] ("the parties agree that VCA is entitled to seek a return of the Rebates as a consequence of Chadwell's default under the [LSA].") Nonetheless, the district court granted Chadwell's summary judgment motion and denied Antech's summary judgment motion, thus prohibiting Antech from recovering *any* lost future profits for Chadwell's breach of the LSA. [JA 394]. In doing so, the district court committed three reversible errors.

*First,* the court erred by granting Chadwell's summary judgment motion. The parties agreed that the LSA was breached. Antech submitted a wide range of evidence supporting its damages calculation, much more than the "scintilla" of evidence needed to establish a triable issue of fact. Chadwell critiqued that evidence, but offered no evidence of its own or an expert to support its position. The district court then impermissibly weighed the sufficiency and "reasonableness" of Antech's evidence, giving Chadwell the benefit of any reasonable inferences, rather than Antech, even though Chadwell's summary judgment motion was at issue. This was error. The district court may not have liked Antech's evidence or believed that it would withstand Chadwell's counter-arguments, but it should not have taken the issue of damages from the jury.

***Second***, in concluding that awarding Antech its lost profits would be "unconscionable," [JA 394], the district court misapplied California law. The court failed to cite any evidence or case law to support its conclusion. It failed to review the LSA under California's traditional unconscionability analysis to determine whether there was both procedural and substantive unconscionability. Nothing in the record suggests there is either. Dr. Gold admitted that he thought entering into the LSA was a "no-brainer" for Chadwell. There is no hint of coercion or lack of meaningful alternatives or any other indicia of an unconscionable contract provision. In light of the relevant evidence, concluding that an award of lost future profits is unconscionable is contrary to California law.

***Third***, the district court erred when it failed to grant Antech's summary judgment motion. Antech was the only party submitting evidence on the issue of its lost future profits. Antech demonstrated with "reasonable certainty" its lost future profits. Rather than submit contrary evidence quantifying Antech's lost profits, Chadwell simply criticized Antech's submission. However, Chadwell's criticisms do nothing more than highlight the difference between a "reasonably certain" estimate of the future and a mathematically precise calculation. California law only requires the former, not the latter. Moreover, it is axiomatic that a party must submit evidence in opposition to a summary judgment motion. Attorney

argument cannot defeat a well-supported motion for summary judgment. Therefore, the court should have granted Antech's summary judgment motion.

For these reasons, this Court should reverse the district court's judgment and grant Antech's summary judgment motion. At a minimum, this Court should: (1) reverse the district court's summary judgment in favor of Chadwell and its conclusion that awarding Antech its lost future profits would be unconscionable, and (2) remand the case for trial so that a jury can weigh the evidence of damages.

## ARGUMENT

### I.    Standard of Review.

This Court reviews *de novo* a district court's grant of summary judgment, viewing the evidence and drawing all inferences in the light most favorable to the non-moving party. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive a summary judgment motion, the non-movant must produce more than a "scintilla of evidence," but it "need only present evidence from which a jury *might* return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 257 (1986) (emphasis added).

When parties submit cross-motions for summary judgment, the district court must consider each motion individually and the facts relevant to each must be

viewed in the light most favorable to the non-movant. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003); *Monumental Paving & Excavating, Inc. v. Pa. Mfrs' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (court must "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard.").

"[E]ach party, as a movant for summary judgment, bears the burden of establishing no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied his burden and should be granted summary judgment on the other motion." 10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, §2720 (3d ed. 2004); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.120 (3d ed. 2004) ("filing of cross-motions does not . . . establish that one side is entitled to judgment as a matter of law").

## II.  The District Court Erred When It Misapplied The Proper Summary Judgment Inferences and Granted Chadwell's Summary Judgment Motion.

Responding to multiple orders from the district court, Antech submitted a substantial amount of evidence regarding its lost profits. That evidence included testimony from key executives of both parties, financial records detailing actual invoices for services performed before Chadwell breached the LSA, and detailed

documentation estimating the future profits Antech lost because of the breach.  In assessing this evidence, the district court did not treat each party's motion for summary judgment separately as required under well-established precedent.  The district court's failure to do so resulted in it weighing the evidence and making credibility determinations, all against Antech, despite Antech's non-movant status.

Making credibility determinations and weighing the evidence is for the ultimate fact-finder and inappropriate at the summary judgment stage.  Antech submitted substantial amounts of evidence in opposition to Chadwell's summary judgment motion.  At a minimum, Antech should have received the benefits of the inferences that it is entitled to as the non-moving party.  The failure to apply the correct legal standard caused the district court to take away the issue of damages from the jury. Based on the legal standard used when cross motions for summary judgments are filed and the applicable facts that were designated in opposition to Chadwell's motion for summary judgment, this court should reverse the district court's order granting Chadwell's summary judgment motion.

**A.    The District Court Was Required To Treat Each Motion Separately, Giving All Reasonable Inferences To The Non-Movant In Each Case.**

In its second opinion, the district court did not distinguish between Chadwell's motion and Antech's motion, or indicate that it was considering them separately in any respect.  This was error.

- 23 -

When a district court decides cross-motions for summary judgment, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant. *Rossignol*, 316 F.3d at 523. Without the advance express stipulation of the parties, cross-motions for summary judgment may not be treated as submissions for a bench trial under Fed. R. Civ. P. 52 in which a court can weigh conflicting evidence and find disputed factual issues. *Kagan v. Unum Provident*, 775 F.Supp.2d 659, 672 n.26 (S.D.N.Y. 2011).

"The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." 10A WRIGHT & MILLER, *supra*, § 2720. As one court has explained, the filing of cross-motions for summary judgment may not eliminate the need for a trial:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3rd Cir. 1968); *see also ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment — even where . . . both parties have filed cross motions for summary

- 24 -

judgment."); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 511 n.7 (4th Cir. 2002).

Cross motions for summary judgment do not change the standard the district court applies. The court "may not resolve genuine issues of material fact. Instead, [it must] rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Monumental Paving & Excavating*, 176 F.3d at 797. "[T]he denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quotations omitted).

### B.    The District Court Erred By Giving Chadwell The Benefit Of Disputed Inferences On Chadwell's Motion For Summary Judgment.

Antech designated hundreds of pages of evidence to support its position that lost profits, not simply the return of rebates, was the appropriate measure of damages.[6]    Among these hundreds of pages, the principal evidence included

---

[6] To be sure, lost future profits (or Antech's expectation interest), rather than the restitutionary remedy of returning the rebates, is the appropriate measure of damages. *New West Charter Middle School*, 187 Cal. App. 4th at 844. Antech is entitled to "the benefit of the bargain that full performance would have brought." *Id.*; *see also* Civil Code §3300 ("For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."). Returning the rebates simply places the parties where they would have been had no contract existed, not where they would have been had the contract been fully performed.

- 25 -

testimony from Bruce Bargmann, Antech's Vice-President ("Bargmann") – Finance/Controller and designated Rule 30(b)(6) representative -- and documentation supporting Antech's calculation of lost future profits. Bargmann explained how he calculated Antech's lost estimated revenue for the three years left under the LSA by first quantifying Antech's revenue for 2010, using actual invoices, and then applying a reasonable 4% annual revenue increase based on Antech's industry experience. Using this methodology, Antech calculated its estimated lost future revenue to be: $89,627 for 2011, $93,212 for 2012 and $96,940 for 2013. [JA. 267 & 288].

From Antech's estimated lost revenue, Bargmann subtracted Antech's estimated variable costs – "a cost that fluctuates depending on revenue" – to establish its lost profits for 2010 of $61,274 on the Chadwell account. [JA. 267, 293-94, 310 & 337]. Going forward, Antech applied the same 4% increase to Antech's variable costs for 2011, 2012 and 2013. The difference between its estimated lost revenue and its foregone variable costs resulted in Antech's estimated lost profits under the LSA of: $63,635 for 2011; $66,181 for 2012; and $68,828 for 2013, which total $198,644. [JA. 267 & 288].

Chadwell has never argued that Bargmann's testimony is improper lay testimony, nor has it argued that it violates Federal Rule of Evidence 702. Chadwell introduced no testimony, expert or otherwise, to refute Antech's lost

- 26 -

profits analysis prepared by its Vice-President – Finance/Controller.  Instead, it argued that Antech was limited under the LSA to recovering the rebates received by Chadwell.  As to the calculation of the lost profits, Chadwell's defense was limited to attorney argument, which does not create an issue of material fact. "The arguments of counsel . . . fail to meet the evidentiary standard necessary to create a genuine issue of material fact."  *Rountree v. Fairfax County School Board*, 933 F.2d 219, 223 (4th Cir. 1991) (citation omitted).

Despite Chadwell's failure to designate an expert or provide an alternative lost profits calculation, the district court impermissibly attacked Antech's calculation of its company-wide variable cost rate, maintaining that it was lacking in three areas.[7]  [JA 391-93].  The district court's analysis is inappropriate at the summary judgment stage.  The Supreme Court has explained that "the weighing of evidence . . . [is a] jury function[ ], not [one for] a judge, [when ] ruling on a motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 255.  Moreover, courts have long recognized that the determination of damages is a fact question under California law.  *Seffert v. Los Angeles Transit Lines,* 367 P.2d 337, 342 (Cal. 1961) ("The amount of damages is a fact question, first committed to the discretion of the

---

[7] Notably, the district court did not question Antech's ability to establish its lost revenue with reasonable certainty so much as it found fault with its variable cost calculation.  [JA 391 n.3].

- 27 -

jury and next to the discretion of the trial judge on a motion for new trial."). Even Chadwell agreed that damages was a fact question for the jury. *See supra* at 15.

To the extent the district court credited Chadwell's criticisms made by counsel, it should have denied the motions for summary judgment and allowed a jury to assess and weigh Bargmann's lost profits analysis. *See, e.g.*, *Arntz Contracting Co.*, 47 Cal.App.4th at 489 ("criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence. It is for the trier of fact to accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial court's award of lost profits"); *see also Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919-20 (9th Cir. 2001)(same). Because the parties agreed that Chadwell breached the LSA and the only issue was the amount of damages, Antech should have received the benefit of the inferences owed to it on the damages issue as the non-moving party. The district court failed to do this and instead usurped the jury's fact-finder role by weighing the damages evidence itself and deciding the evidence was insufficient.

a.    California Law Supports Antech's Lost Profits Calculation.

Notwithstanding the district court's improper assumption of the fact-finding role, the fact remains that Antech's calculation of lost profits is consistent with California law. In *Grupe v. Glick*, 26 Cal.2d 680 (1945), the California Supreme

Court explained the standard for recovering lost profits as damages for breach of contract:

> [W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.

*Id.* at 692 (citations omitted); *see also Natural Soda Prod. Co. v. City of Los Angeles*, 23 Cal.2d 193, 199 (1943) (if the business's operating experience permits a reasonable estimate of probable income and expense, then lost profits are awarded as damages); *Hoag v. Jenan*, 86 Cal.App.2d 556, 563 (Cal.App. 2d Dist. 1948) (for established businesses, "the authorities unanimously hold that the loss of prospective profits are ordinarily recoverable, for the reason that the working experience of the business affords a reasonable method of determining the loss, and that in such cases the damages occasioned by the loss are not speculative and uncertain."); *Guntert v. City of Stockton*, 55 Cal.App.3d 131, 143 (Cal. Ct. App. 1976) (historical data, like past business volume, was acceptable basis for ascertaining lost future profits); *Hacker Pipe & Supply Co. v. Chapman Valve Mfg. Co.*, 17 Cal.App.2d 265, 268 (Cal. App. 2d Dist. 1936) (same). Because it was an established business, Antech could rely on its past business volume and experience to determine its lost profits.

- 29 -

Antech can recover its lost profits even if they cannot be shown with mathematical precision. *Stott v. Johnston*, 36 Cal.2d 864, 875-76 (1951). That is, Antech is "not required to establish the amount of its damages with absolute precision, and [is] only obliged to demonstrate its loss with reasonable certainty." *S.C. Anderson, Inc. v. Bank of America Nat'l Trust & Savings Ass'n*, 24 Cal.App.4th 529, 536-37 (1994). Calculating *future* revenues, expenses, and profits, requires estimates and assumptions that, by definition, cannot be absolutely precise. *See, e.g., S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.*, 58 Cal.App. 3d 173, 184 (Cal. App. 2d Dist. 1976) ("[w]e are aware of no case . . . involving the determination of damages in a civil case in which the use of projections has been held to be impermissible."). Furthermore, "[s]ince defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated." *Sanchez-Correa v. Bank of America*, 38 Cal.3d 892, 908 (1985)(citation omitted).[8]

---

[8] *See also Aronowicz v. Nalley's, Inc.*, 30 Cal.App.3d 27, 53 (Cal. App. 2d Dist. 1972) ("Where the promisor, by his wilful breach of contract, has given rise to the difficulty of proving the amount of loss of profits, it is proper to require of the promisee only that he show the amount of damages with reasonable certainty, and to resolve uncertainties against the promisor. . . . While Civil Code, section 3301, provides that no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin, the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery.").

Moreover, the reasonableness of Antech's lost profits calculation is reinforced by the fact that Antech's estimated 2011 revenue ($66,645.67) closely approximated Chadwell's actual laboratory billings from IDEXX, Antech's competitor ($67,971.49). [JA. 267 & 326-35]. The fact that Antech's estimated revenue and IDEXX's actual invoices differed by less than $1,400 (or 1.9%, with Antech's estimate the more conservative) corroborates Antech's methodology.

The reasonableness of Antech's calculation is further buttressed by the provisions of the LSA itself. According to the LSA, Chadwell "is required to utilize Antech to provide Laboratory Services required by [Chadwell] in an amount equal to a minimum of $78,000 or $6500 net per month (the "Minimum Average Annual Fee"), *in accordance with the provisions of Section 1 below*." [JA 21] (emphasis added).

The district court incorrectly read the Minimum Average Annual Fee to dictate only whether or not Chadwell was eligible for the rebate. [JA 263] ("the LSA does not obligate Defendant to spend the minimum fee. Rather, the minimum fee is merely the condition Defendant must fulfill in order to earn a rebate."). This is incorrect. Section 1 describes the exclusivity provision and its exceptions. It says nothing about the terms and conditions of the loyalty rebate, which is discussed in Section 3. [JA 22-23]. The Minimum Average Annual Fee provides the baseline for the amount of services Antech must provide Chadwell over the

- 31 -

term of the LSA. While the court's interpretation of the Minimum Average Annual Fee provision is incorrect, this error does not change the lost revenue analysis because Antech has demonstrated that Chadwell actually purchased services in excess of the Minimum Average Annual Fee every month after it entered into the LSA [JA 251, 348-55; 155 9:12 (last lab service on November 16, 2010)] and for the subsequent period when it purchased services from IDEXX. [JA 326-35].

Such evidence, combined with Bargmann's testimony and Antech's other evidence, demonstrates that Antech submitted proof of its lost profits with the reasonable certainty required by California law, and more than enough to withstand Chadwell's summary judgment motion.

In *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal.App.4th 847, 889-90 (Cal. Ct. App. 2000), the appellant argued that the calculation of future earnings was too speculative. *Id.* at 861-64. The court rejected this argument and described the evidence presented on lost profits:

> The evidence relating to the calculation of lost profits was presented by [a co-owner], who performed accounting work . . . [The co-owner] reported the income and expenses of the company for the first three months of the year and projected a probable profit of about $500,000 for the first year of the contract term and a 10 percent growth rate for the second and third years. From the projected profit, he deducted lease payments by Shade in the amount of $228,000 in each of the three years and arrived at a total of $971,000 in lost profits. For his part, [another co-owner] verified the income and expense statement for the first three months of 1994 and described his experience in the

nut processing business and the availability of other potential customers besides Shade.

*Id*. at 889. The court concluded that "the jury could infer that, in light of the availability of other potential business, the company's income and expense statement for the first three months of 1994 provided a reasonable basis for projecting lost profits over the remainder of the [contract]." *Id*. at 890.

The same reasoning should apply here, particularly since Antech provided substantially more than three months of actual results. To defeat Chadwell's summary judgment motion, Antech merely needed to demonstrate that there were genuine issues of material fact about the amount of damages. *See, e.g.*, *Johnson v. Stanhiser*, 72 Cal.App.4th 357 (Cal.App. 4th Dist. 1999) (under California law, "[p]laintiff's burden was to establish a prima facie showing that he was damaged"). Antech was entitled to receive the benefit of all inferences related to the evidence it submitted. Antech's evidence, critiqued but unrebutted, was sufficient to require the district court to deny Chadwell's summary judgment motion.

> b. The Northern District Of Illinois Accepted Antech's Lost Profits Calculation In A Remarkably Similar Case Applying California Law.

Antech's lost profits calculation was recently accepted by the Northern District of Illinois in a nearly identical breach of contract case. *Antech Diagnostics, Inc. v. Downers Grove Animal Hosp. & Bird Clinic, P.C.*, Civil Action No. 12C2736, 2013 WL 773034 (N.D. Ill. Feb. 28, 2013). In *Downers*

*Grove*, Antech and the defendants entered into a lab services agreement which provided that "Antech [would] be the animal hospital's exclusive provider of laboratory services for five years . . . [and] that the animal hospital owner must spend at least $48,000 annually on Antech's laboratory services." *Id*. at *2. The *Downers Grove* LSA also was governed by California law.

The defendants terminated their LSA for much the same reasons that Chadwell did. *Id*. at *3. On summary judgment, Antech presented the following evidence concerning its lost profits under the LSA:

> As of February 28, 2012, defendants had paid Antech $106,359.28 for laboratory services. Antech asserts it would have received $240,000 if the agreement had lasted the full 60–month term, leaving a balance of $133,640.72. Brian Brown, Antech's Assistant Comptroller, believes Antech saved 31.7% of the $133,640.72 by not having to perform, making Antech's damages under the agreement $91,276.61.

> *Id*. (internal citations omitted).

The *Downers Grove* defendants argued that Brown's testimony should be disregarded because it was improper lay witness testimony. The court disagreed, noting that Federal Rule of Evidence 701 permits "[o]fficers of a business to testify to the value or projected profits of the business based on particularized knowledge resulting from their position in the business." *Id*. at *7 (citation omitted). The court summarized Brown's testimony as follows:

> Brown has been Antech's assistant comptroller for five years. . . . He calculated damages by subtracting the amount defendants paid for laboratory services ($106,359.28) from the minimum amount Antech

would have received if the agreement had lasted the full 60–month term ($240,000). Multiplying the balance ($133,640.72) by 68.3% (a percentage reflecting his belief, based on his knowledge of the costs of Antech's laboratory services, that Antech saved 31.7% by not having to perform), Antech's damages are $91,276.61.

*Id*. The *Downers Grove* defendants maintained that Brown's calculations were both "'overly simplistic' and too complex to be made by a layperson . . . [, noting] Brown ha[d] never testified in court or been qualified as an expert." *Id*. The defendants also "[took] issue with Brown's failure to break out discounts from revenue, asserting numerous variables, besides price discounts, affect revenue but are not included in Brown's calculations." *Id*.

The court found that "Defendants' criticisms are plausible but unsupported, so they do not counter Antech's damage calculation" and went on to say "Antech's admissible lay opinion testimony supports its damages calculation, while defendants' conjecture neither creates a material issue of disputed fact nor entitles them to prevail on their cross-motion for summary judgment. The court accepts Brown's damages calculation of $91,276.61." *Id*. (citations omitted).

As in *Downers Grove*, Antech presented its lost profits analysis through the testimony of one of its officers, Bargmann, who is Brown's supervisor. Chadwell, like the *Downers Grove* defendants, advanced plausible, but unsupported, criticisms of Antech's admissible damages evidence. *Id.* As in *Downers Grove,*

Chadwell's "conjecture neither creates a material issue of disputed fact nor entitles them to prevail on their cross-motion for summary judgment."

As the breaching party, Chadwell cannot now argue that Antech's damages calculation is not detailed enough. *Macken v. Martinez*, 214 Cal.App.2d 784, 790 (1963) ("As defendant's wrongful conduct made the exact ascertainment of damages difficult, he cannot complain because the court must make an estimate of the damage and not an exact computation, provided, of course, that the estimate is a reasonable one."). Antech established its lost future profits of $198,644 under the LSA with reasonable certainty. Consequently, summary judgment should have been entered in favor of Antech and against Chadwell. At a minimum, Chadwell's motion for summary judgment should have been denied. The Court erred when it granted Chadwell's summary judgment motion.

## III.   The District Court Erred When It Concluded That Awarding Lost Profits Under The LSA Was Unconscionable.

The district court further erred when it decided, in the alternative, that awarding Antech its lost future profits would be unconscionable. [JA 394]. The court concluded that "even if Plaintiff had established that Defendant's breach caused it to lose anticipated profits of $198,644.00, the court would find such an award of damages in this case to be unconscionable." *Id.*; *see MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 346 n.4 (1986) (alternative holdings are not dicta). In doing so, the court relied on Civil Code § 3359, which

- 36 -

provides that "where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered," [JA 394] and on RESTATEMENT (SECOND OF CONTRACTS) § 351 (1981), which provides that "a court may limit damages for foreseeable loss by excluding recovery for loss of profits . . . if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."

The court reasoned that awarding lost profits would be unconscionable because it would cause Chadwell to "pay twice for all of its lab testing requirements for a three-year period – once to compensate the replacement company that performs the tests and once to compensate Plaintiff for its lost profits" despite the fact that Antech would, according to the court, "not [be] performing any services." [JA 394]. It also pointed to the three remaining years on the LSA's term and Antech's alleged "total lack of detrimental reliance" due to the LSA's non-exclusive nature, as additional factors to support its conclusion that awarding lost profits to Antech would be "grossly oppressive." [JA 394].

However, the district court erred on multiple levels in concluding that awarding Antech its lost profits would be "unconscionable" under California law. First, it erred by even addressing this argument; Chadwell waived it as an affirmative defense by not raising it in its answer and not asserting it until after

discovery closed.  Second, it failed to provide the parties, particularly Antech, with the statutorily-required opportunity to present evidence with respect to the unconscionability of awarding lost future profits.  Third, the court erred by not applying the analysis typically used by California courts when determining whether a contract provision is unconscionable.  Fourth, the court erred because, if taken at face value, its analysis means that awarding future profits is always unconscionable when dealing with service agreements because the breaching party would always have to "pay twice."  And finally, it failed to consider the case law interpreting both the "unconscionability" doctrine and Civil Code §3359.

### A.   Chadwell Waived Its Unconscionability Argument By Only Raising It After Discovery Closed.

As an initial matter, the district court should not have addressed this issue because Chadwell waived it.  Despite its obligation under Rule 8(c), Chadwell never asserted unconscionability as an affirmative defense.  [JA 14-16]; Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense.").  It was not until Chadwell moved for summary judgment, [R. 44-1], five days after discovery closed on June 22, 2012, that Chadwell first claimed that awarding lost future profits would be unconscionable. Antech noted in its briefing that Chadwell had never raised this before.  [R.47-1, p.10].

Some courts in this Circuit have concluded that the mere failure to plead an affirmative defense waives it. *Imgarten v. Bellboy Corp.*, 383 F. Supp. 2d 825, 846 (D. Md. 2005). Other courts have concluded that, "[a]lthough it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver," *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 612 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), "absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion." *Id.*; *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 205 n.3 (4th Cir. 2004) (same).

Here, it makes no difference whether the *per se* rule or the "unfair surprise or prejudice" rule applies because Antech clearly has been unfairly surprised and prejudiced by Chadwell's failure to raise unconscionability as a defense until after discovery closed. Antech had no prior notice that Chadwell would raise this defense, thereby increasing the likelihood of prejudice to Antech. *See Brinkley*, 180 F.3d at 613. Once discovery was closed, the district court repeatedly stated that it would not be reopened. [JA 265, 385]. As a result, Antech was unable to elicit, through discovery, evidence that would refute Chadwell's assertion of unconscionability. And, despite the court's multiple requests for additional evidence and argument, it never raised the issue of unconscionability at all. This

- 39 -

failure is all the more prejudicial because, under California law, "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." Civil Code §1670.5(b). Chadwell's failure to notify Antech that it would assert unconscionability until after discovery closed effectively foreclosed Antech's ability to conduct necessary discovery and assert its rights under California law.

**B.     The District Court Failed To Adhere To Civil Code §1670.5.**

"While unconscionability is ultimately a question of law, numerous factual inquiries bear upon the question." *Walnut Producers of California v. Diamond Foods, Inc.*, 187 Cal. App. 4th 634, 644 (2010) (internal quotation and citation omitted). "[A] claim of unconscionability often cannot be determined merely by examining the face of a contract, but will require inquiry into its commercial setting, purpose, and effect." *Independent Ass'n of Mailbox Center Owners, Inc. v. Superior Court*, 133 Cal.App.4th 396, 407 (2005) (internal quotation and citation omitted). In fact, when it "appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." Civil Code §1670.5 (emphasis added).

- 40 -

The district court failed to do this, and particularly given this case's procedural history, that failure constitutes reversible error. Once Chadwell asserted that awarding lost future profits would be unconscionable, the court was obligated to afford the parties a "reasonable opportunity to present evidence" on this issue. *Id.* The court failed to do this. This is particularly problematic given that, in its first decision: (1) it stated that Antech was "correct in asserting that it can recover its lost profits in this case, assuming they can be proven with reasonable certainty." [JA 263]; (2) it disposed of Chadwell's assertion that such damages were unconscionable by stating that, since Antech's lost profits had yet to be proven, "[t]here is thus no way to tell at this point whether or not an award of those profits would be unconscionable." [JA 261]; and (3) the court took a very active role in telling the parties what damages-related issues it wanted further briefing and evidence about and never instructed the parties to present evidence about the "commercial setting, purpose, and effect" of calculating damages under the LSA. Therefore, Antech has been substantively prejudiced by the court's determination that awarding lost future profits would be unconscionable without providing Antech a "reasonable opportunity" to present evidence on this issue.

## C. The District Court Failed To Employ The Unconscionability Analysis Typically Required By California Law.

Under well-established California law, "[u]nconscionability has both procedural and substantive elements." *Wayne v. Staples, Inc.*, 135 Cal.App.4th

466, 480 (Cal. App. 2nd Dist. 2006). "Both must appear for a court to invalidate a contract or one of its individual terms, but need not be present in the same degree." *Id.* (citations omitted). "'[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Id.* (quoting *Armendariz v. Foundation Health Psychcare Serv., Inc.*, 24 Cal.4th 83, 114 (2000)).

"Procedural unconscionability focuses on the elements of oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the terms of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior bargaining position." *Id.* (internal citations and quotations omitted).

Substantive unconscionability "focuses on the actual terms of the agreement and evaluates whether they create 'overly harsh' or 'one-sided' results, that is, whether contractual provisions reallocate risks in an objectively unreasonable or unexpected manner. To be substantively unconscionable, a contractual provision must shock the conscience." *Id.* (internal citations and quotations omitted). The district court erred because it did not even attempt this analysis. Had it done so, it

- 42 -

would have concluded that the LSA cannot be deemed unconscionable because it is neither procedurally nor substantively unconscionable, let alone both.

a.    Lost Future Profits Damages Are Not Procedurally Unconscionable.

There can be no procedural unconscionability because Chadwell did not, and cannot, show either oppression or surprise. Oppression requires an "inequality of bargaining power" that that "results in no real negotiation and an absence of meaningful choice." *Id.* While Antech may well be affiliated with a substantially larger corporation than Chadwell, there was no "inequality of bargaining power." *Id.* Gold testified that he asked for McLean to draft the agreement that ultimately became the LSA. [JA 97]. The meeting with McLean where Gold signed the LSA was "nonchalant." He chose the LSA's term, and he could have chosen a much shorter term had he desired. In fact, there is nothing in the record indicating that Chadwell could not have continued using Antech's services without entering into the LSA at all. As such, nothing in the record remotely suggests that the transaction resulted from "coercion" or "lack of choice, the usual hallmarks of procedural unconscionability." *Wayne*, 135 Cal.App.4th at 482.

Even if there was an inequality of bargaining power, "[t]here can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices: '[A]ny claim of 'oppression' may be defeated if the complaining party has

- 43 -

reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable.'" *Id.* at 482. While the terms of Chadwell's agreement with IDEXX are not in the record – other than that its term is precisely the same length that Chadwell now objects to for the LSA –IDEXX clearly was a "reasonably available alternative" supplier because Chadwell began using IDEXX's services immediately.

There also is no "surprise" here. "Surprise involves the extent to which the terms of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior bargaining position." *Id.* The LSA is only six pages long, single-sided. There is nothing "prolix" about it. The relevant provisions are not "hidden" in any way. While the parties dispute the interpretation of the LSA, its relevant terms are not in small print, on the back, or otherwise not plainly visible.

b.    Lost Future Profits Damages Are Not Substantively Unconscionable.

With no procedural unconscionability, the inquiry can stop. There can be no finding of unconscionability. *Id.* Nonetheless, awarding lost future profits is also not substantively unconscionable. The analysis for substantive unconscionability "focuses on the actual terms of the agreement and evaluates whether they create 'overly harsh' or 'one-sided' results." *Id.* This is a very high bar. As the *Wayne* court stated:

> The phrases 'harsh,' 'oppressive,' and 'shock the conscience' are not synonymous with 'unreasonable.' Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis. 'With a concept as nebulous as "unconscionability" it is important that courts not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable. The terms must shock the conscience.

*Id.* at 483.  In *Wayne*, the 100% mark-up that Staples charged its customers for insurance when shipping through UPS, even though Staples bore none of the risk of shipping, was deemed not to shock the conscience as a matter of law.  *Id.*  And in *Aron v. U-Haul Co. of California*, the court concluded, as a matter of law, that U-Haul's re-fueling practices, including charging customers a $20 fee to re-fuel, "additional charges for fuel used but not replaced, and its allegedly illegal measuring system" did not shock the conscience and so was not substantively unconscionable.  143 Cal.App.4th 796, 809 (Cal. App. 2d Dist. 2006).

The district court's decision makes clear that it simply engaged in a "reasonableness" analysis, which is contrary to California law.  According to the court, if Antech had presented evidence of its lost profits with reasonable certainty, "it is likely that Plaintiff could have established that an award of some of its lost profits would be reasonable."  [JA 394, n.6].  In essence, the court has said that, while some lost profits "would be reasonable," the amount Antech sought went beyond that, *i.e.*, it was "unreasonable."  However, "[b]asing an unconscionability

determination on the reasonableness of a contract provision" is "inappropriate" and "inject[s]" too much "judicial subjectivity into the analysis." *Wayne*, 135 Cal.App.4th at 483; *Aron*, 143 Cal.App.4th at 809 (same); *Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 1322-23 (Cal. App. 2005). If the lost profits Antech sought were simply "unreasonable," by definition they do not "shock the conscience" and so are not substantively unconscionable.

The district court erred, therefore, both by failing to conduct the unconscionability analysis typically employed when construing a contractual provision and by failing to conclude, based on traditional concepts of procedural and substantive unconscionability, that it is not unconscionable to interpret the LSA to permit an award of lost future profits.

### D.    The District Court Erred When It Effectively Ruled That Breaching A Service Agreement Can Never Result In Lost Future Profits.

The court's footnote regarding its unconscionability analysis highlights its fundamental internal contradiction. [JA 394, n.6]. The court initially objects to the fact that, under Antech's damages theory, Chadwell would have to "pay twice for all of its lab testing requirements for a three-year period" because it breached the LSA, "once to compensate [IDEXX] and once to compensate Plaintiff for its lost profits" even though Antech would no longer be "performing any services." [JA 394]. However, the court acknowledges such an outcome is not unique to this

case; to the contrary, it is the "natural consequence[] of allowing plaintiffs to seek lost profits for breaches of requirement contracts." *Id.* The court then tries to minimize the impact of its conclusion by stating that awarding "some of its lost profits would be reasonable" if Antech had offered sufficient evidence of its damages. *Id.*

If the court's assertion that "some reasonable portion of [Antech's] lost profits" might have been awarded, then the court has engaged in a prohibited reasonableness analysis rather than the required substantive unconscionability analysis. *Wayne*, 135 Cal.App.4th at 483. On the other hand, if the court's decision about unconscionability rests on the fact that Chadwell would have to "pay twice," which the court concedes is the "natural consequence[]" of awarding lost profits in breach of requirements contracts cases, [JA 394, n.6], the court has implicitly determined that any award of lost future profits in a requirements contract is per se unconscionable. This, however, goes against established law in California and elsewhere. *See Holmestake Mining Co. v. Talcott*, 161 Cal.App.2d 566, 571 (Cal.App. 4th Dist. 1958) (allowing lost future profits damages for requirements contract when defendant failed to provide adequate amounts of ore to plaintiff to be milled and then terminated contract); *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1334, 1340-41 (7th Cir. 1988) (Posner, J.) (for propane requirements contract, it was bad faith for buyer not to abide by contract

establishing minimum number of units to purchase and obligation to purchase all propane for eight years; jury award of over $3 million, which was jury's estimate of propane that would have been consumed over 8 years, affirmed).

From either perspective then, the district court erred in concluding that no future profits could be awarded.

### E.    The District Court Failed To Consider California Case Law When Construing The Unconscionability Doctrine And Civil Code §3359.

The district court also failed to follow California law in two other respects: (1) it erred by deciding the "reasonableness" of lost future profit damages in the first instance, rather than submitting it to the jury; and (2) it erred by relying implicitly on *Postal Instant*.

First, while a damages award must be reasonable, Civil Code §3359, reasonableness is a factual question for the jury. *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1602 (Cal. App. 4th Dist. 2012*); Ray v. Jackson*, 219 Cal.App.2d 445, 451 (Cal.App.1st Dist. 1963); *Seffert*, 56 Cal.2d at 506-07.  Even Chadwell agreed with this.  *See supra* at 15.  "[W]hat is a reasonable amount is a question upon which there may legitimately be a wide difference of opinion."  *Eggink v. Robertson*, 191 Cal. App. 2d 496, 502 (Cal. App. 3d Dist. 1961).  Any decision about the excessiveness of a jury's damages award is made after trial.  *Ray*, 219 Cal.App.2d at 451; *Horowitz v. Fitch*, 216 Cal.App.2d 303 (Cal. App. 1st Dist.

1963). Contrary to the court's concern that awarding lost future profits would be unconscionable, California (and other courts) have concluded, for requirements contracts, that awarding lost profits is not "excessive" and is consistent with California (and other) law. *Holmestake Mining Co.*, 161 Cal.App.2d at 571; *see Empire Gas Corp.*, 840 F.2d at 1340-41.

The court also erred to the extent that it relied implicitly on *Postal Instant*. In fact, *Postal Instant*, which Chadwell cited repeatedly to support its unconscionability argument in the district court, highlights why the district court should *not* have concluded that awarding lost profits would be unconscionable. In *Postal Instant*, the Sealys were franchisees who entered into a 20-year franchise agreement with Postal Instant Press, Inc., ("Postal Instant"), an international printing franchisor. 43 Cal.App.4th at 1706-07. In return for various services from Postal Instant, the Sealys agreed to pay monthly royalties of 7% of their gross revenues. *Id.* The franchise agreement defined numerous "material breach[es]" of the agreement, including any failure to pay the monthly fees within ten days after notice. *Id.* Years later, the Sealys failed to timely make several monthly payments. Thereafter, Postal Instant "declared the overdue payments for past royalties constituted a material breach and sent the Sealys a termination letter." *Id.* at 1707. Postal Instant's termination letter instructed the Sealys to cease conducting business "immediately" as a Postal Instant franchise. *Id.*

- 49 -

Postal Instant sued the Sealys for breach of contract action seeking both past and future royalties. *Id.* at 1707-08. After a bench trial, the trial court awarded damages to Postal Instant, including the present value of Postal Instant's "estimated future profits." *Id.* at 1708. On appeal, the appellate court examined the contractual language, the parties' franchisor-franchisee relationship, and the parties' conduct and ultimately reversed the trial court for two reasons. First, Postal Instant was only entitled to recover those damages proximately caused by the breach. The Sealys' failure to make timely past royalty payments owed to Postal Instant was not a natural and direct cause of Postal Instant's failure to receive future royalty payments (which were caused by Postal Instant's unilateral termination of the contract). Therefore, Postal Instant was not entitled to these damages. *Id.* at 1709-1710, 1713.

Second, the court held that "lost future profits" would violate Section 3359. *Id.* at 1715, 1717. The court reasoned that the franchisor-franchisee relationship had many of the attributes of consumer adhesion contracts, including an inequality of economic resources between franchisees and franchisors, and a "gross bargaining disparity" as exemplified by a take-it-or-leave-it agreement that Postal Instant could terminate for "virtually any reason." *Id.* at 1716. Relying on Civil Code §3359 and the RESTATEMENT, the court concluded that allowing Postal Instant to unilaterally terminate the contract and then sue for "lost future profits"

would expand "the already enormous bargaining gap between this franchisor and this franchisee" and be unconscionable. *Id.* at 1717-18.

The differences between Postal Instant and this case underscore that *Postal Instant* is misapplied here. First, the *Postal Instant* trial court only made its findings after conducting a *bench trial*. It did not decide the propriety of awarding damages on summary judgment as the district court did here.[9]  Second, the appellate court limited its holding to a situation where the franchisor terminated the agreement. It expressly stated that it was "unnecessary . . . to consider what 'future lost profits' damages might be appropriate where a franchisee rather than the franchisor unilaterally terminates the agreement." *Id.* at 1718. So, even assuming Antech's relationship with Chadwell is anything like a franchisor-franchisee relationship (and it is not), *Postal Instant* does not apply because Chadwell terminated the LSA, not Antech. Antech did not strategically terminate the contract and then seek the contract's benefits. Finally, there is no "gross bargaining disparity" between Antech and Chadwell. The LSA is a straightforward contract between two commercial entities. Chadwell chose the contract term at a "nonchalant" meeting between Dr. Gold and McLean. Nothing in the record suggests that Chadwell was pressured, lacked alternatives, or was

---

[9] The appellate court stated that the appeal "is from the trial, and not the summary judgment." *Id.* at 1707, n.1; *id.* at 1708 (judgment came "[a]fter a bench trial").

required to agree to the LSA in any way.  *Postal Instant* simply has no bearing on this case.

The district court's decision to employ Civil Code §3359 at summary judgment to conclude that the LSA was unconscionable, rather than leaving the damages issue to the jury, was contrary to California law and should be reversed.

## IV.    The District Court Erred When It Failed To Grant Summary Judgment In Favor Of Antech.

Both parties filed summary judgment motions.  At a minimum, the district court should have denied both motions.  But a closer examination of the materials submitted demonstrates that the district court should have reached the same conclusion that the *Downers Grove* court did.  Because Chadwell failed to submit its own evidence creating a genuine issue of material fact, the district court should have granted Antech's motion for summary judgment.

Even after giving Chadwell the benefit of the inferences owed to it as the non-moving party, Antech was still entitled to summary judgment.  Antech submitted the same type of evidence that prevailed in *Downers Grove*.  Unlike the *Downers Grove* defendants, Chadwell never objected to this evidence as improper lay witness testimony. Chadwell did, however, level objections as to the accuracy of Antech's estimated lost profits.  The *Downers Grove* defendants made similar arguments which were rejected by that court: "Antech's admissible lay opinion testimony supports its damages calculation, while defendants' conjecture neither

creates a material issue of disputed fact nor entitles them to prevail on their cross-motion for summary judgment. The court accepts Brown's damages calculation of $91,276.61." *Downers Grove,* 2013 WL 773034 at *7.

The district court should have applied this same reasoning here and concluded that Antech was entitled to summary judgment. If Chadwell wanted to defeat Antech's summary judgment motion, it was required to put forth its own evidence. Instead, Chadwell merely asserted attorney argument, which is not enough to create a genuine issue of material fact. Chadwell did not offer its own evidence, expert or otherwise, in opposition to Antech's motion for summary judgment. Antech was therefore entitled to summary judgment, and respectfully requests that this Court reverse the denial of its summary judgment motion.

## CONCLUSION

For all the foregoing reasons, the district court erred in granting Chadwell's motion for summary judgment and in denying Antech's motion for summary judgment. Antech requests that this court reverse the district court's decision, and direct the district court to enter summary judgment in Antech's favor and against Chadwell. Alternatively, Antech requests that this court reverse the district court's decision, and direct the district court to deny both parties' motions for summary judgment so the matter may proceed to trial where a jury can weigh the evidence of the damages Antech suffered.

## **REQUEST FOR ORAL ARGUMENT**

Antech respectfully requests oral argument.  Oral argument will illuminate the position of the parties and aid the court in reaching a decision.

Respectfully submitted,


/s/ Brian E. Casey
BARNES & THORNBURG LLP
Brian E. Casey
David R. Pruitt
6th Floor, 1st Source Bank Center
100 N. Michigan Street
South Bend, Indiana 46601
Telephone: (574) 233-1171
Fax: (574) 237-1125

SPENCE & BUCKLER, P.C.
Patrick R. Buckler
100 W. Pennsylvania Ave.
Suite 301
Towson, Maryland 21204
Telephone: (443) 470-9105
Fax:  (443) 769-1562

Attorneys for Plaintiff-Appellant
VCA Cenvet, Inc.

## **RULE 32 CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume requirements of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,470, based on word processing software, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Brian E. Casey*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2013, I electronically filed the foregoing Brief for Appellant VCA Cenvet, Inc. with the Clerk of Court using the court's CM/ECF system, which will serve a copy on counsel of record for the other parties. A paper courtesy copy was also provided to counsel of record.

*/s/ Brian E. Casey*

*Counsel for VCA Cenvet, Inc.*

SBDS01 382764v1